UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETER A. CHIEJINA and PICCOL
NIGERIA LTD.,

Petitioners,

vs.

FEDERAL REPUBLIC OF NIGERIA,

Respondent

No.

**MEMORANDUM IN SUPPORT OF**
**<u>PETITION TO CONFIRM FOREIGN ARBITRAL AWARD</u>**

Theodore J. Folkman
FOLKMAN LLC
53 State St., Suite 500
Boston, MA 02109
(617) 219-9664
ted@folkman.law

*Attorney for the Petitioners*

## TABLE OF CONTENTS

Table of Authorities ............................................................................................................ iii

Preliminary Statement ......................................................................................................... 1

Background ........................................................................................................................... 1

   A.   The Contract .............................................................................................................. 1

   B.   Nigeria Breaches the Contract. ................................................................................. 2

   C.   The Petitioners Demand Arbitration. ........................................................................ 3

   D.   The Arbitrator Awards Damages to the Petitioners. ................................................. 4

   E.   Nigeria Fails to Pay .................................................................................................. 7

Argument ............................................................................................................................. 7

   A.   The Award Must Be Confirmed Under the New York Convention and the Federal
       Arbitration Act. ......................................................................................................... 7

      1.   The Arbitration Agreement Was Valid. ........................................................... 9

      2.   Nigeria Had Notice And An Opportunity To Present Its Case. ...................... 10

      3.   The Award Decided A Dispute The Parties Had Agreed To Arbitrate. ......... 10

      4.   The Arbitral Procedure Was As Agreed. ....................................................... 11

      5.   The Award Is In Effect And Binding In Nigeria. ........................................... 11

      6.   A Construction Contract Dispute Is Arbitrable Under US Law. .................... 11

      7.   US Public Policy Supports Confirmation. ...................................................... 11

   B.   Nigeria Is Not Immune From Suit. ......................................................................... 12

      1.   The Arbitration Exception to Foreign Sovereign Immunity Applies. ............ 12

      2.   Nigeria Has Implicitly Waived Its Immunity From Suit. .............................. 13

   C.   Judgment Should Be Denominated In Dollars, And The Court Should Convert From
       Naira To Dollars As Of The Dates Given in the Award. ....................................... 14

      1.   The Judgment Should Be Denominated In Dollars. ...................................... 14

      2.   Currency Conversion Dates. .......................................................................... 17

Conclusion ......................................................................................................................... 20

TABLE OF AUTHORITIES

<u>Cases</u>

*Allied-Bruce Terminix Cos. v. Dobson,*
   513 U.S. 265 (1995) ..................................................................................................11

*BCB Holdings Ltd. v. Gov't of Belize,*
   110 F. Supp. 3d 233 (D.D.C. 2015), *aff'd,* 650 Fed. App'x 17 (D.C. Cir. 2016) ......................9

*Belize Bank Ltd. v. Gov't of Belize,*
   852 F.3d 1107 (D.C. Cir. 2017)..................................................................................11

*Belize Soc. Dev. Ltd. v. Gov't of Belize,*
   668 F.3d 724 (D.C. Cir. 2012)....................................................................................8

*Buckeye Check Cashing, Inc. v. Cardegna,*
   546 U.S. 440 (2006) ..................................................................................................9

*Chevron Corp. v. Republic of Ecuador,*
   795 F.3d 200 (D.C. Cir. 2015)..................................................................................12

*Cont'l Transfer Technique Ltd. v. Fed. Gov't of Nigeria,*
   932 F. Supp. 2d 153 (D.D.C. 2013), *aff'd* 603 Fed. App'x 1 (D.C. Cir. 2015) ............14, 15, 18

*Cont'l Transfer Technique, Ltd. v. Fed. Gov't of Nigeria,*
   603 Fed. App'x 1 (D.C. Cir. 2015)..............................................................................17

*Creighton Ltd. v. Gov't of Qatar,*
   181 F.3d 118 (D.C. Cir. 1999)..................................................................................13

*Customs & Tax Consultancy LLC v. Democractic Republic of the Congo,*
   2019 U.S. Dist. LEXIS 162136 (D.D.C. Sept. 16, 2019)........................................................16

*Dawnays Ltd. v. F.G. Minter Ltd.,*
   [1971] 2 All ER 1389 (CA) (Eng.)..............................................................................19

*Diag Human S.E. v. Czech Republic—Ministry of Health,*
   824 F.3d 131 (D.C. Cir. 2016)....................................................................................7

*Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria,*
   2017 U.S. Dist. LEXIS 230552 (D.D.C. Apr. 26, 2017)........................................................18

*Konoike Constr. Co. v. Ministry of Works of Tanz.,*
   2019 U.S. Dist. LEXIS 37052 (D.D.C. Mar. 6, 2019) ..........................................................16

*Leidos, Inc. v. Hellenic Republic,*
   881 F.3d 213 (D.C. Cir. 2018)..............................................................................16, 17

*LLC Komstroy v. Republic of Moldova,*
    2019 U.S. Dist. LEXIS 143739 (D.D.C. Aug. 23, 2019) ........................................................17

*LLC SPC Stileks v. Republic of Moldova,*
    985 F.3d 871 (D.C. Cir. 2021) ...............................................................................................12

*Preston v. Ferrer,*
    552 U.S. 346 (2008) ...............................................................................................................12

*Process & Indus. Devs. v. Fed. Republic of Nigeria,*
    962 F.3d 576 (D.C. Cir. 2020).................................................................................................13

*Process & Indus. Devs. v. Fed. Republic of Nigeria,* 506 F. Supp. 3d 1 (D.D.C. 2020) ........13, 14

*Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. Kommanditgesellschaft v. Navimpex Centrala Navala,*
    989 F.2d 572 (2d Cir. 1993) ...................................................................................................13

*Sterling Merchant Fin. Ltd. v. Republic of Cabo Verde,*
    261 F. Supp. 3d 48 (D.D.C. 2017) ...........................................................................................9

*Tatneft v. Ukraine,*
    771 Fed. App'x 9 (D.C. Cir. 2019), *cert. denied,* 140 S. Ct. 901 (2020) ...................................13

*United States ex rel. Milestone Tarant, LLC v. Fed. Ins. Co.,*
    672 F. Supp. 2d 92 (D.D.C. 2009) .........................................................................................11

<u>Statutes</u>

9 U.S.C.  § 201 ..............................................................................................................................8

9 U.S.C. § 202 ..............................................................................................................................7

9 U.S.C. § 207 ..............................................................................................................................8

28 U.S.C. § 1330 ........................................................................................................................12

28 U.S.C. § 1604 ........................................................................................................................12

28 U.S.C. § 1605(a)(1) ...............................................................................................................13

28 U.S.C. § 1605(a)(6) ...............................................................................................................12

Arbitration and Conciliation Act (2004) Cap. (A18) § 12(2) (Nigeria) .........................................9

Arbitration and Conciliation Act (2004) Cap. (A18) § 29(1) (Nigeria) .........................................7

Arbitration and Conciliation Act (2004) Cap. (A18) § 51(1) (Nigeria) .......................................11

Treaties

Convention on the Recognition and Enforcement of Foreign Arbitral Awards,
Jun. 10, 1958, art. V, 21 U.S.T. 2517, T.I.A.S. No. 6997 ....................................................9, 10

Rules

Fed. R. Evid. 201(b)(2)......................................................................................................................20

Other Authorities

Chijioke Ohuocha, *Nigeria Lets Naira Weaken in Possible Move to Unify Exchange Rates,*
*available at* https://www.reuters.com/world/africa/nigerian-naira-drops-record-low-official-
market-after-devaluation-2021-05-14/ (May 14, 2021) ...........................................................14

Chilke Olisah, *Naira Falls at Black Market as Dollar Supply Drops by 18.14%, available at*
https://nairametrics.com/2021/08/06/naira-falls-at-black-market-as-dollar-supply-drops-by-18-
14/ (Aug. 6, 2021) .....................................................................................................................15

*Restatement (Fourth) of the Foreign Relations Law of the United States,*
§ 490 (2019) .........................................................................................................15, 16, 17, 18

*Restatement (Third) of the Foreign Relations Law of the United States*
§ 823 (1987) ....................................................................................................................15, 18

*Restatement of the US Law of International Commercial & Investor State Arbitration*
§ 1.1 (Final Draft Apr. 24, 2019)................................................................................................8

PRELIMINARY STATEMENT

This is a petition for an order recognizing and confirming a foreign arbitral award against the Federal Republic of Nigeria and for entry of judgment on the award. The case is straightforward. The government of Nigeria and an engineering firm, PICCOL Nigeria Ltd. ("PICCOL"), entered into a contract for the construction of gully erosion control structures. In the contract, they agreed to arbitrate disputes. A dispute arose due to Nigeria's months-long delays in payments due under the contract. PICCOL and its principal, Peter A. Chiejina, demanded arbitration. The parties proceeded to arbitrate the dispute at the Regional Centre for International Commercial Arbitration, Lagos, as their contract required. The arbitrator awarded damages to PICCOL and Mr. Chiejina ("the Petitioners"). Nigeria has failed to pay. Under the New York Convention and Chapter 2 of the Federal Arbitration Act, the Petitioners are entitled to confirmation of the award and to judgment.

BACKGROUND

A.  The Contract

PICCOL, an engineering firm, entered into a contract with the Government of the Federal Republic of Nigeria, dated April 20, 2005. The contract was for construction of gully erosion control structures. Mr. Chiejina, PICCOL's managing director, signed on behalf of PICCOL Nigeria. Col. Musa Mohammed, the Minister of Inter-Governmental Affairs, Special Duties and Youth, and the Chairman of the National Committee on Ecological Problems, signed on behalf of the Nigerian government. The contract consists of a main contract document and several documents incorporated by reference, including the tender, the letter of award and the letter of acceptance, the General Conditions of Contract, the specifications, drawings, and bill of

quantities, and the schedule of rates and prices. (Contract ¶ 4.0).[1] The total contract price was ₦255,898,518.75, and PICCOL agreed to complete the work within 52 weeks of receipt of the agreed advance payment of ₦63,974,629.69. (Contract ¶¶ 8.0, 11.0). PICCOL received the advance payment on May 23, 2006. (Award ¶ 21.4).[2]

The contract provided that payments would be made "against a certificate issued under the hand of the Consultants containing a full-itemized statement of the estimated value of the works executed including materials for construction on site, up to the period covered by the statement." (Contract ¶ 2.0(ii)). Under the Contract, Nigeria was obligated to "issue the appropriate certificate and pay to [PICCOL] any sums due to it with minimal delay." (Contract ¶ 19.0). Interest at 5% was to be paid on "all overdue payments from the date on which the same should have been made." (Standard Conditions of Contract ¶ 60(3)).

The contract also contained the following agreement to arbitrate disputes:

Any dispute, controversy or claim arising out of or relating to this contract or the breach, termination or invalidity thereof, shall be settled by arbitration at the Regional Centre for International Commercial Arbitration, Lagos, under the applicable Arbitration Rules in the schedule to the Arbitration and Conciliation Act Cap. 19 Laws of the Federation of Nigeria 1990.

(Contract ¶ 18.0).

B. Nigeria Breaches the Contract.

As the arbitrator found (Award ¶ 28.0(1)), Nigeria breached the contract by delaying payment on several of the interim payment certificates beyond what the contract permitted.

---

[1] A true copy of the Contract is attached as Exhibit 1 to the Declaration of Theodore J. Folkman. The exhibit includes the main contract document and the Standard Conditions of Contract (called the "General Conditions of Contract" in ¶ 4.0 of the Contract), but excludes the schedules, drawings, specifications, etc., which are not material to this petition.

[2] A true copy of the Award is attached as Exhibit 2 to the Folkman Declaration.

While the contract required payment with "minimal delay," payments on some certificates were delayed for months. (Award ¶ 24.10(d)(xxix)(a)). Specifically:

- IPC 1 was dated Nov. 28, 2006 and paid on Feb. 28, 2007. (Award ¶¶ 24.10(D)(xxi)(a), 24.10(D)(xxii)(a)).

- IPC 2 was dated Mar. 29, 2007 and paid on Aug. 23, 2007. (Award ¶¶ 24.10(D)(xxi)(h), 24.10(D)(xxii)(b)).

- IPC 3 was dated Jun. 26, 2007.and paid on Dec. 27, 2007. (Award ¶¶ 24.10(D)(xxi)(*i*), 24.10(D)(xxii)(c)).

- IPC 4 was dated Jan. 10, 2008 and paid on Apr. 7, 2008. (Award ¶¶ 24.10(D)(xxi)(j), 24.10(D)(xxii)(d)).

- IPC 5 was dated Mar. 26, 2010 and paid (in part) on Oct. 5, 2010. (Award ¶¶ 24.10(D)(xxi)(k)), 24.10(D)(xxii)(e)).

Nigeria, the arbitrator found, also wrongfully reduced the amount of one interim payment certificate that had been certified for payment. (Award ¶ 27.3(ii)). Specifically, although the amount certified in IPC 5 was ₦30,486,151.17, Nigeria unilaterally reduced that amount to ₦12,144,406.52. (Award 24.10(D)(xxii)(e)).

C. The Petitioners Demand Arbitration.

On March 26, 2014, the Petitioners served a Notice of Arbitration, and on July 1, 2014, they demanded arbitration at the Abuja Multidoor Courthouse, an ADR program in Abuja, Nigeria. (Award ¶¶ 12.1-12.2). Those proceedings were inadmissible, because the parties' contract called for arbitration at the Regional Centre for International Commercial Arbitration, Lagos, and Nigeria objected on the grounds that the Abuja Multidoor Courthouse lacked jurisdiction. (Award ¶ 12.3). The Petitioners therefore requested arbitration at the Regional

Centre for International Commercial Arbitration on August 3, 2016. (Award ¶ 12.4). Nigeria was notified of the proceeding on September 29, 2016. (Award ¶ 12.4). The sole arbitrator, Dorothy Udeme Ufot, SAN,[3] was appointed by the Regional Centre on October 26, 2016. Ms. Ufot is a fellow of the Chartered Institute of Arbitrators (UK) and a chartered arbitrator. She was formerly a member of the Court of Arbitration of the International Chamber of Commerce in Paris and is on the panel of arbitrators of the International Centre for the Settlement of Investment Disputes, among many other professional distinctions. (Folkman Decl. Ex. 3).

Nigeria participated in the proceedings and was represented by counsel throughout. (Award ¶ 9.1(ii)). It filed Points of Defense, Witness Statements, and Opening and Closing Submissions, among other documents. (Award ¶ 13.2). It also made a preliminary objection to the arbitrator's jurisdiction, which the arbitrator denied. (Award ¶¶ 15.1, 15.12). An evidentiary hearing was held on April 10, 2018, at which Nigeria was present and represented by counsel, and the proceedings were declared closed on November 1, 2018, after the submission of closing submissions. (Award ¶ 19.1).

D. The Arbitrator Awards Damages to the Petitioners.

The arbitrator issued her award on June 7, 2019. She ruled in the Petitioners' favor on some issues and in Nigeria's favor on others. She found for the Petitioners on the claim that Nigeria had unduly delayed payments and that it had wrongfully and unilaterally reduced the amount of one contractually required payment. But she rejected other claims. For example, she rejected the Petitioners' claim for payment of an interim payment certificate no. 6, in the amount of ₦ 12.163 million, on the grounds that the certificate was not issued as required in the contract. (Award. ¶ 27.3(iii)). She rejected their claim for ₦83.916 million for extra work performed on

---

[3] "SAN" stands for "Senior Advocate of Nigeria," the Nigerian equivalent of "Queen's Counsel."

the ground that there was no written contract for that work. (Award ¶ 27.3(iv)). She rejected their claim for ₦50 million in general damages for breach of contract on the grounds that they would be duplicative of the special damages awarded. (Award ¶ 27.3(x)).

The arbitrator also rejected Nigeria's defenses. For example, she rejected its jurisdictional arguments that there was a defect in the Notice of Arbitration and in service of the Notice of Arbitration. (Award ¶ 15.12(1)-(2)). She also rejected Nigeria's claim that the arbitration was barred by the statute of limitations. (Award ¶ 15.12(3)). The arbitrator also rejected Nigeria's argument that PICCOL had represented that it had the financial capacity to do the contracted work without receiving interim payments, and its argument that the Petitioners' financial capacity to do the work without receiving payments was a term of the contract. (Award ¶ 24.10(D)(xxix)(j)-(l). Finally, the arbitrator rejected Nigeria's arguments that the Petitioners had breached the contract by abandoning the site, suspending the work, failing to complete the project within a year, and failing to insure the project. (Award ¶ 24.9(G)(C)).

While Nigeria never challenged the arbitrability of Mr. Chiejina's claims against it and never asserted that he was an improper party to the arbitration, and while the Award runs in favor of both PICCOL and Mr. Chiejina, the arbitrator did not award any damages on account of the loss Mr. Chiejina claimed he suffered individually, specifically, interest on the mortgage loan on his residence that he had to take in order to fund ongoing work in light of Nigeria's delays in payment (Award ¶ 21.31(iii)) and emotional distress due to the mortgagee's threats to sell his home (Award ¶ 21.32).

The arbitrator awarded the following relief to the Petitioners (Award at pp. 116-117):

1.  A declaration that Nigeria is liable for breach of contract.

2. Damages in the amount of ₦18,341,744.65, which was the amount by which Nigeria had wrongfully reduced the amount of interim payment certificate no. 5. The arbitrator awarded interest at the contract rate of 5% from May 30, 2016, to the date of the award, "and thereafter at the same rate of 5% per annum until the whole sum is fully liquidated." This amount was to be paid within 21 days of the date of the award.

3. Damages in the amount of ₦6,240,117.11, which represented interest at 5% on the delayed payment of several interim payment certificates. The arbitrator awarded interest at the contract rate of 5% from May 30, 2016, to the date of the award, "and thereafter at the same rate of 5% per annum until the entire sum is fully liquidated." This amount was to be paid within 21 days of the date of the award.

4. Damages in the amount of ₦245,980,000.00, which represented the cost of "equipment idle time or loss of use due to incessant delays." (Award ¶ 27.3(vii)). The arbitrator awarded interest at the contract rate of 5% from April 2, 2013, to the date of the award, "and thereafter at the same rate of 5% per annum until the entire sum is fully liquidated." This amount was to be paid within 21 days of the date of the award.

5. Damages in the amount of ₦51,179,663.75, which represented PICCOL's lost profit. The arbitrator awarded interest at the contract rate of 5% from October 25, 2010, which was the date work finally stopped, to the date of the award, "and thereafter at the same rate of 5% per annum till the entire sum is fully liquidated." This amount was to be paid within 21 days of the date of the award.

6. Costs of arbitration in the amount of ₦8,261,026.54. Costs were to be paid within 21 days of the date of the award, and interest at 5% was to run thereafter until paid in full.

E.  Nigeria Fails to Pay

The award required Nigeria to pay the damages awarded, with interest, within twenty-one days (and costs within twenty-one days of the award). But although the award was issued more than two years ago, Nigeria has paid nothing. Its time to seek to set aside the award has long expired: under Nigerian law, an application to set aside an award must be made within three months of the date of the award. *See* Arbitration and Conciliation Act (2004) Cap. (A18) § 29(1) (Nigeria).[4]

ARGUMENT

A.  The Award Must Be Confirmed Under the New York Convention and the Federal Arbitration Act.

The United States and Nigeria are parties to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Jun. 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997 ("the New York Convention," or "the Convention"). An arbitral award falls under the Convention if it arises out of "a legal relationship, whether contractual or not, which is considered as commercial," unless it is "entirely between citizens of the United States." 9 U.S.C. § 202. The award here plainly falls under the Convention. It is not entirely between citizens of the United States, and it concerns a commercial dispute. The award is "commercial" because it refers to "matters or relationships, whether contractual or not, that arise out of or in connection with commerce," namely, a contract for engineering and construction work. *See Diag Human S.E. v. Czech Republic—Ministry of Health,* 824 F.3d 131, 136 (D.C. Cir. 2016). An award may be commercial even though one of the parties to it is a sovereign state. *Restatement of the US Law*

---

[4] The Act is reprinted in 4 Int'l Council for Comm. Arb., *Int'l Handbook on Comm. Arb. —Fed. Rep. of Nigeria* (Boseman, ed. 2020).

*of International Commercial & Investor State Arbitration* § 1 (Final Draft Apr. 24, 2019) § 1.1(e) & cmt. e.

The United States has implemented the New York Convention in Chapter 2 of the Federal Arbitration Act, 9 U.S.C. § 201 *et seq.* ("the FAA"). *See* 9 U.S.C. § 201. Under the FAA, the Court must confirm a foreign arbitral award unless one of the grounds for refusing or deferring recognition or enforcement set out in the Convention itself exists. *See* 9 U.S.C. § 207. The Court has "little discretion in refusing or deferring enforcement of foreign arbitral awards: the Convention is clear that a court may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention." *Belize Soc. Dev. Ltd. v. Gov't of Belize,* 668 F.3d 724, 727 (D.C. Cir. 2012) (citations and internal quotation marks omitted).

Article V of the Convention provides seven grounds for denying or deferring recognition and enforcement, which can be summarized as follows:

1. The parties were under some incapacity or the agreement to arbitrate is otherwise invalid.

2. The losing party did not have proper notice of the appointment of the arbitrators or of the proceedings or was otherwise unable to present its case.

3. The award resolved a dispute that the parties did not submit to arbitration.

4. The procedure used in the arbitration, or the composition of the arbitral authority, was contrary to the parties' agreement.

5. The award has not yet become binding or has been set aside or suspended in the country where the award was made.

6. The subject matter of the dispute is not capable of settlement by arbitration in the country where recognition is sought (here, the United States).

7. Recognition or enforcement would be contrary to public policy in the country where sought (here, the United States).

*See* Convention art. V. It would be Nigeria's "heavy burden" to show that one of these grounds exists. *See Sterling Merchant Fin. Ltd. v. Republic of Cabo Verde,* 261 F. Supp. 3d 48, 53 (D.D.C. 2017). Nigeria could never make such a showing.

    1.   <u>The Arbitration Agreement Was Valid.</u>

Nigeria made no argument about the validity of the agreement to arbitrate below. Indeed, by objecting to arbitration at the Abuja Multidoor Courthouse on the grounds that the parties had agreed instead to arbitrate at the Regional Centre for International Commercial Arbitration in Lagos, Nigeria affirmatively asserted the validity of the agreement. Nigeria has never suggested that the agreement to arbitrate was invalid or that it or PICCOL lacked capacity to enter into the agreement to arbitrate. In any case, even if Nigeria could raise a question about the validity of the contract between itself and PICCOL, such a challenge would not be enough to draw the validity of the agreement to arbitrate itself into question but would instead be a matter that was for the arbitrator to decide. *See Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 449 (2006); *BCB Holdings Ltd. v. Gov't of Belize,* 110 F. Supp. 3d 233, 248 (D.D.C. 2015), *aff'd,* 650 Fed. App'x 17 (D.C. Cir. 2016). *See also* Arbitration and Conciliation Act § 12(2) ("[A]n arbitration clause which forms part of a contract shall be treated as an agreement independent of the other terms of the contract and a decision by the arbitral tribunal that the contract is null and void shall not entail *ipso jure* the [in]validity of the arbitration clause").

2.  <u>Nigeria Had Notice And An Opportunity To Present Its Case.</u>

The arbitrator rejected Nigeria's argument that it had received insufficient notice, which was in any event a formal argument that did not call into question whether Nigeria had actual knowledge of the proceedings. (Award ¶ 15.12). Not only did Nigeria have an opportunity to present its case—it used its opportunity to the fullest, participating in all stages of the proceedings through counsel.

3.  <u>The Award Decided A Dispute The Parties Had Agreed To Arbitrate.</u>

The agreement to arbitrate extended to "[a]ny dispute, controversy or claim arising out of or relating to this contract or the breach, termination or invalidity thereof." There can be no dispute that the dispute between the parties arose out of or related to the contract, because the claim was that Nigeria had breached the contract by delaying payments contrary to the contract's requirements and by unilaterally reducing the amount to be paid, contrary to the contract's requirements.

Nigeria did not argue to the arbitrator that it had not submitted the dispute between Mr. Chiejina personally and Nigeria to arbitration. But in any event, the arbitrator did not award any damages on account of Mr. Chiejina's personal claims, and if there were any question about Mr. Chiejina's status as a claimant, it would not interfere with confirmation. Under the Convention, if an award "contains decisions on matters beyond the scope of the submission to arbitration," then as long as those matters can be separated, then "that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced." Convention art. V(1)(c).

4. _The Arbitral Procedure Was As Agreed._

The parties agreed to arbitrate under the rules of the Regional Centre for International Commercial Arbitration, Lagos, and the arbitration was conducted under those Rules, to which the arbitrator referred throughout the Award. Moreover, the arbitrator was appointed by the Director of the Regional Centre in accordance with its rules. (Award ¶¶ 12.6-12.7).

5. _The Award Is In Effect And Binding In Nigeria._

Nigeria has never sought to have the award set aside, or its effect suspended, in Nigeria. The award was and remains entitled to recognition under Nigerian law. _See_ Arbitration and Conciliation Act, § 51(1).

6. _A Construction Contract Dispute Is Arbitrable Under US Law._

There can be no question that a dispute about a breach of a construction contract concerns a subject matter that is arbitrable under US law. The Federal Arbitration Act's application extends to the full reach of the Commerce Clause.  _See Allied-Bruce Terminix Cos. v. Dobson,_ 513 U.S. 265, 277 (1995). A claim of breach of a construction contract is self-evidently within the scope of the statute. _See, e.g., United States ex rel. Milestone Tarant, LLC v. Fed. Ins. Co.,_ 672 F. Supp. 2d 92 (D.D.C. 2009).

7. _US Public Policy Supports Confirmation._

The public policy defense applies only "where enforcement would violate the [United States'] most basic notions of morality and justice." _Belize Bank Ltd. v. Gov't of Belize,_ 852 F.3d 1107, 1111 (D.C. Cir. 2017) (citation and internal quotation marks omitted). Nothing about the award in the case could even approach raising an issue about such a fundamental violation of norms of morality and justice. Not only is confirmation of this award _consistent_ with US public policy; public policy strongly supports confirmation. The national policy of the United States

favors arbitration "when the parties contract for that mode of dispute resolution." *Preston v. Ferrer,* 552 U.S. 346, 349 (2008).

    B.  <u>Nigeria Is Not Immune From Suit.</u>

        1.  <u>The Arbitration Exception to Foreign Sovereign Immunity Applies.</u>

Foreign states are generally immune from suit in American courts. *See* 28 U.S.C. § 1604. However, a foreign state is not immune from suit in any case "in which the action is brought … to confirm an award made pursuant to" an "agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which … may arise between the parties with respect to a defined legal relationship … concerning a subject matter capable of settlement by arbitration under the laws of the United States," if the agreement or award "is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6).

To show that the arbitration exception to foreign sovereign immunity applies, a petitioner must show the existence of the agreement to arbitrate, the arbitral award, and a treaty governing the award. *LLC SPC Stileks v. Republic of Moldova,* 985 F.3d 871, 877 (D.C. Cir. 2021). The Petitioners have the initial burden to show that the exception applies, which they can satisfy by producing the treaty, the agreement to arbitrate, and the arbitral award. *See Chevron Corp. v. Republic of Ecuador,* 795 F.3d 200, 204 (D.C. Cir. 2015). The Petitioners have met this minimal burden by submitting copies of the agreement to arbitrate and the arbitral award and citing the New York Convention. The Petitioners have demonstrated *supra* that the treaty governs the Award. Thus, Nigeria is not immune from suit and this Court has jurisdiction. *See* 28 U.S.C. § 1330.

2.   Nigeria Has Implicitly Waived Its Immunity From Suit.

A foreign state is not immune from suit in any case "in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver." 28 U.S.C. § 1605(a)(1). While the DC Circuit has not definitively ruled on the question, *see Process & Indus. Devs. v. Fed. Republic of Nigeria,* 962 F.3d 576, 583-84 (D.C. Cir. 2020) (noting prior decisions), this Court has recently held that a country that becomes a party to the New York Convention does implicitly waive its immunity from suit in other signatory states on claims for confirmation of arbitral awards against it. *See Process & Indus. Devs. v. Fed. Republic of Nigeria,* 506 F. Supp. 3d 1, 7-10 (D.D.C. 2020), *appeal docketed,* No. 21-7003 (D.C. Cir. Jan. 13, 2021) [*PI&D*]. The Court noted that the Second Circuit had reached that conclusion in *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. Kommanditgesellschaft v. Navimpex Centrala Navala,* 989 F.2d 572 (2d Cir. 1993), and that while the DC Circuit had not "adopted *Seetransport's* waiver rule as binding Circuit law, … it has come close." *PI&D,* 506 F. Supp. 3d at 7. In *Tatneft v. Ukraine,* 771 Fed. App'x 9, 10 (D.C. Cir. 2019), *cert. denied,* 140 S. Ct. 901 (2020), an unpublished decision, the DC Circuit adopted the waiver rule, and in *Creighton Ltd. v. Gov't of Qatar,* 181 F.3d 118, 123 (D.C. Cir. 1999), the court, in dicta, said that the Second Circuit's reasoning was correct.

The rule of implicit waiver finds support not just in precedent but in the Convention itself, as this Court recognized in *PI&D.* The Convention applies to "the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought," Convention art. I, and it requires each contracting state to "recognize arbitral awards as binding and enforce them …," *id.* art. III. "[N]o

13

state could sign such a document without contemplating that it would be subject to actions for enforcement of arbitral awards in the courts of other Convention signatories, including the U.S." *PI&D,* 506 F. Supp. 3d at 8 (citations omitted). The text of the Convention demonstrates Nigeria's implicit agreement to be subject to suit in other contracting states even if the seat of the arbitration is in Nigeria, as in this case, since the Convention makes no exception to the rule requiring recognition and enforcement in every contracting state in cases where the arbitration takes place in the state of the losing party. *See PI&D,* 50 F. Supp. 3d at 8 n.4.

C. <u>Judgment Should Be Denominated In Dollars, And The Court Should Convert From Naira To Dollars As Of The Dates Given in the Award.</u>

1. <u>The Judgment Should Be Denominated In Dollars.</u>

Although the Award was denominated in Nigerian naira, the Petitioners request and are entitled to entry of a judgment in US dollars. Issuance of a judgment in dollars when the underlying award is stated in a foreign currency "is the norm rather than the exception." *Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria,* 932 F. Supp. 2d 153, 158 (D.D.C. 2013), *aff'd* 603 Fed. App'x 1 (D.C. Cir. 2015). Entering an award in dollars, when requested by the judgment or award creditor, is particularly important in cases such as this, where the foreign currency has dropped precipitously in value over time. The naira was worth 0.0066 dollars on October 25, 2010, the date the work stopped, and 0.0033 on June 7, 2019, the date of the Award. It is worth 0.00243 dollars today. And while the future is uncertain, it is unlikely the naira's fortunes will be reversed. *See, e.g.,* Chijioke Ohuocha, *Nigeria Lets Naira Weaken in Possible Move to Unify Exchange Rates, available at* https://www.reuters.com/world/africa/nigerian-naira-drops-record-low-official-market-after-devaluation-2021-05-14/ (May 14, 2021); Chilke Olisah, *Naira Falls at Black Market as Dollar Supply Drops by 18.14%, available at* https://nairametrics.com/2021/08/06/naira-falls-at-black-market-as-dollar-supply-drops-by-18-

14/ (Aug. 6, 2021). Issuing a judgment in a depreciating foreign currency "finds no support in the case law," and it would "reduce the value of the award" while "rewarding a debtor who has delayed in carrying out the obligation." *Cont'l Transfert,* 932 F. Supp. 2d at 158.

The *Restatement (Third) of the Foreign Relations Law of the United States* is consistent with this argument: "Courts in the United States ordinarily give judgment on causes of action arising in another state, or denominated in a foreign currency, in United States dollars …." *Restatement (Third) of the Foreign Relations Law of the United States* § 823(1) (1987). The policy is "to place the judgment creditor … in a position as close as possible to that in which he would have been if the obligation had been carried out by the judgment debtor or if the injury had not occurred." *Id.* cmt c. "In general, if the foreign currency has depreciated since the injury or breach, judgment should be given at the rate of exchange applicable on the date of injury or breach." *Id.*

In the *Restatement (Fourth) of the Foreign Relations Law of the United States,* the ALI has suggested that the presumption in favor of dollar-denominated judgments is weaker than stated in the *Restatement (Third)*. Instead of asserting that courts "ordinarily give judgment … in United States dollars," the new *Restatement* says simply that the court "may issue its own judgment denominated either in [the] foreign currency or in U.S. dollars …" *Restatement (Fourth) of the Foreign Relations Law of the United States,* § 490(1) (2019). But even the new *Restatement* continues to advise courts to "consider[] the interests of the parties as well as the practical consequences." *Id.* cmt. b. The reporters suggest that "[t]he wide dissemination of hedging mechanisms undercuts arguments for special rules to protect the judgment debtor from fluctuations in the currency used in a foreign judgment." *Id.* rptr's n. 4, though a business whose owner had had to mortgage his home to provide working capital to continue the project in light

15

of the foreign state's failure to make interim payments would hardly have been in a position to purchase a hedging contract. They also note that several states have adopted the Uniform Foreign-Money Claims Act, under which a court has the power to issue a judgment in dollars on a foreign judgment "only if the judgment creditor does not ask for a U.S. judgment in foreign currency." *Id.* rptr's n. 3.

Neither this Court nor the D.C. Circuit have apparently considered the new *Restatement. Cf. Leidos, Inc. v. Hellenic Republic,* 881 F.3d 213, 220 (D.C. Cir. 2018) (court indicated it was deciding the case without considering the substance of the *Restatement (Fourth)*).[5] And this Court has continued to rely on the *Restatement (Third). See Customs & Tax Consultancy LLC v. Democratic Republic of the Congo,* 2019 U.S. Dist. LEXIS 162136, at *16 (D.D.C. Sept. 16, 2019); *Konoike Constr. Co. v. Ministry of Works of Tanz.,* 2019 U.S. Dist. LEXIS 37052, at *12 n.2 (D.D.C. Mar. 6, 2019).

The reporters of the *Restatement (Fourth)* do not suggest that development in the case law supports the weakening of the presumption in favor of dollar-denominated judgments over the prior *Restatement,* instead pointing to "the trend in subsequent State statutes allowing courts to enter judgments denominated in foreign currencies." *Restatement (Fourth)* § 490, rptr's n. 7. Those state statutes, of course, do not govern here, because this case arises under federal law. *See id.* rptr's n. 2.

In *Leidos,* the court entered judgment on a foreign arbitral award in foreign currency; but this case is unlike *Leidos* in all important respects. In *Leidos,* the petitioner won an arbitral award against Greece in 2013, denominated in euros, resulting from work done at the 2004 Athens Olympics. It promptly petitioned for confirmation of the award, specifically requesting judgment

---

[5] What the *Leidos* court cited as § 420 of the *Restatement (Fourth),* which had not been released in its final version, was later renumbered § 490.

in euros. The petition was stayed pending the results of parallel litigation in Greece. In 2017, after the Greek litigation concluded, the court entered judgment on the award, denominated in euros. Leidos moved to alter or amend the judgment under Fed. R. Civ. P. 59(e), asking that the judgment be re-issued in dollars, because the dollar had appreciated significantly against the euro during the litigation. This Court granted the motion, but the DC Circuit reversed, holding that the Court had abused its discretion. It noted that "[r]ecent cases have endorsed judgment in a foreign currency if the petitioner requests payment in that currency." *Leidos,* 881 F.3d at 218. But while Leidos "could have asked for dollars instead of euros at any time before judgment; it chose not to." *Id.* at 219. *See also LLC Komstroy v. Republic of Moldova,* 2019 U.S. Dist. LEXIS 143739, at *43 (D.D.C. Aug. 23, 2019) (distinguishing *Leidos* on the grounds that the creditor had "waited to request conversion until *after* the district court's judgment"). Thus the original judgment was not even erroneous "such that it required Rule 59(e) correction or amendment." *Leidos,* 881 F.3d at 218. The court emphasized that its decision was consistent with *Continental Transfer Technique, Ltd. v. Fed. Gov't of Nigeria,* 603 Fed. App'x 1 (D.C. Cir. 2015), in which the court held that "a judgment in a foreign currency should be issued only when requested by the judgment creditor." *Leidos,* 881 F.3d at 220 (citing *Cont'l Tranfert,* 603 Fed. App'x at 4).

In sum, the DC Circuit's precedents show that judgment ordinarily should be entered in dollars unless the judgment creditor specifically requests judgment in the foreign currency. Here the Petitioners expressly seek judgment in dollars.

    2.  <u>Currency Conversion Dates.</u>

Although the *Restatement (Fourth)* suggests that the court should take the date of the US judgment as the date for currency conversion, *See Restatement (Fourth)* § 490(2), the reporters recognize that some courts, including this Court, "have instead used the exchange rate as of the

date that the foreign judgment was rendered." *Id.* rptr's n. 5 ("[S]ome courts have instead used the exchange rate as of the date that the foreign judgment was rendered," citing *Continental Transfer*). This Court's precedents are clear: they adopt the "breach rule" rather than the "judgment rule." *See, e.g., Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria,* 2017 U.S. Dist. LEXIS 230552, at *4-5 (D.D.C. Apr. 26, 2017); *Cont'l Transfer,* 932 F. Supp. 2d at 162-63.

In *Enron Nigeria* and *Continental Transfer,* the Court treated the date of the award as the date of the breach and thus performed the currency conversion as of the date of the award. When, as in this case, the gravamen of the case is delay in payment, and when the foreign currency has substantially depreciated between the date of the breach and the date of the award, that approach fails to honor the policy of the law of governing currency conversion, which is "to make the creditor whole and to avoid rewarding a debtor who has delayed in carrying out the obligation." *Restatement (Third)* § 823(2). Neither of the awards in *Enron Nigeria* and *Continental Tranfert* were about the award debtor's delay in paying money it owed. In *Enron,* nine days after the parties signed an agreement, Nigeria suspended implementation of the contract, and the claim was primarily about lost profits. (Enron Award ¶¶ 35, 47).[6] In *Continental Transfer,* the gravamen of the case was that the Nigerian government had misrepresented the number of units that the claimant would have to manufacture and thus that the claimant had received less than it bargained for. (Continental Award ¶ 30).[7] Here, Nigeria's delay was the key fact in the case, especially in light of the contractual mechanism for interim payment certificates, which should have led to payment with only minimal delay. The arbitrator reasoned that "An architect's certificate is like a bill of exchange i.e. money in the hand and should be honored." (Award ¶

---

[6] A true copy of the *Enron* award is attached as Exhibit 4 to the Folkman Declaration.
[7] A true copy of the *Continental Transfer* award is attached as Exhibit 5 to the Folkman Declaration.

24.8(E)(C)(xvi)) (citing Lord Denning, *150 Contractual Problems & Their Solutions* 136

(2005)). The reason, amply illustrated by this case, is that the contractor cannot go on with the

work if payment is withheld:

> Every businessman knows the reason why interim certificates are issued and why they
> have to be honoured. It is so that the sub-contractor can have the money in hand to get on
> with his work and the further work he has to do. Take this very case. The sub-contractor
> has had to expend his money on steel work and labour. He is out of pocket. He probably
> has an overdraft at the bank. He cannot go on unless he is paid for what he does as he
> does it. An interim certificate is to be regarded virtually as cash, like a bill of exchange. It
> must be honoured. Payment must not be withheld on account of cross-claims whether
> good or bad – except so far as the contract specifically provides. Otherwise any main
> contractor could always get out of payment by making all sorts of unfounded cross-
> claims.

*Dawnays Ltd. v. F.G. Minter Ltd.,* [1971] 2 All ER 1389 (CA) (Eng.) (per Denning M.R.). Here,

the award shows that all the items of damage—interest on the late payments, lost profits, and the

costs associated with idle equipment—were due to the delay.[8]

To be sure, the award carried interest, as provided in the contract. But while the interest

may have compensated the Claimants for the loss of use of the money over a period of time, it

did not compensate them for the dramatic decrease in the value of the award caused by the

naira's massive devaluation. A government that delays in honoring its payment obligations

should not benefit from the devaluation of its own currency.

The Award does not separately award damages for each of the five delayed payments,

nor does interest under the Award run from the dates on which each of the interim payment

certificates were issued. Rather, the arbitrator selected a single date from which interest runs on

the award of lost profits, a single date from which interest runs on the underpayment of IPC 5, a

single date from which interest runs on the equipment idle expenses incurred, and a single date

---

[8] The single exception was damages due to Nigeria's unilateral reduction of the amount due on interim payment
certificate 5.

from which interest runs on the interest awarded for the late payments. The confirming court does not engage in its own factfinding or decision-making on the merits, and therefore, the Court should take the dates on which the arbitrator held that interest should run as the date of currency conversion for the respective items of damages. Applying this methodology results, as of the date of this filing, in a judgment in the amount of $2,907,698.22. (The amount will increase by $279.22 per day to the date of judgment, as interest continues to accrue). The spreadsheet attached to this memorandum as Exhibit 1 shows the calculation.[9]

<u>CONCLUSION</u>

For these reasons, the Court should confirm the Award and enter judgment on the Award in favor of the Petitioners.

Respectfully submitted,

PETER A. CHIEJINA and
PICCOL NIGERIA LTD.

By their attorney:

*/s/ Theodore J. Folkman*

Theodore J. Folkman
FOLKMAN LLC
53 State St., Suite 500
Boston, MA 02109
(617) 219-9664
ted@folkman.law

Dated: August 24, 2021

---

[9] Currency rates are mid-market taken from the website of XE.com, Inc., a currency exchange company, at https://www.xe.com/currencycharts/?from=NGN&to=USD&view=10Y. The Petitioners request that the Court take judicial notice of the currency rates used. *See* Fed. R. Evid. 201(b)(2).